**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 14-cv-00239-REB

MARK R. ASHLEY,

      Applicant,

v.

TRAVIS TRANI, Warden, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

---

**ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS**

---

**Blackburn, J.**

      This matter is before me on the *pro se* **Application for a Writ of Habeas**

**Corpus Pursuant to 28 U.S.C. § 2254** ("the Application") [#4][1] filed by Applicant Mark

R. Ashley.  Respondents filed an **Answer** [#21], and Mr. Ashley filed a **Reply** [#26].

After reviewing the pertinent portions of the record in this case, including the

Application, the Answer, the Reply, and the state court record, I conclude that the

Application should be denied and the case dismissed with prejudice.

**I.  BACKGROUND**

      Mr. Ashley is challenging the validity of his conviction and sentence in Denver

District Court case number 02CR1772.  The relevant factual background and procedural

history were discussed comprehensively by the Colorado Court of Appeals on appeal

---

[1][#4] is an example of the convention I use to identify the docket number assigned to a specific
paper by the court's electronic case filing and management system (CM/ECF).  I use this convention
throughout this order.

from the denial of a postconviction motion.

In October 2001, Ashley approached the female victim, who was using a pay phone outside a convenience store. He put a knife to her throat and forced her to walk behind the store to an unlit area. The victim told Ashley she would give him whatever money she had if he would let her go. Ashley took $20 from the victim and sexually assaulted her.

After the assault, the victim contacted the police, who took her to the hospital where medical personnel prepared a rape kit, including swabs of her vagina and mouth. The police also collected her clothing.

The police did not find any DNA evidence from the swabs, but four months after the assault, it identified semen on the victim's underwear. The lab tested the semen and found DNA. The police compared the DNA with profiles stored in the national Combined DNA Index System (CODIS) and found that it was consistent with Ashley's DNA. Ashley's DNA was in CODIS because he had four prior felony convictions, including a conviction for sexual assault.

After the DNA identification, an investigator compiled a photographic lineup including a picture of Ashley. The victim identified Ashley without hesitation from the lineup. This was the third photographic lineup she had reviewed. In the two previous lineups (which did not include Ashley), she did not identify anyone as her assailant.

In March 2002, Ashley was charged with sexual assault, three sexual assault aggravators, second degree kidnapping, and aggravated robbery.

The trial court appointed the Office of the Public Defender to represent Ashley, and Cyrus Callum was selected to be the lead attorney on the case. Sometime prior to trial, Karen McGovern from the Public Defender's Office joined Callum as co-counsel for Ashley.

At a motions hearing in August 2002, Callum requested (and was granted) a continuance of the trial because he had still not received the DNA evidence from the police lab. In November 2002, during another motions

2

hearing, Ashley personally addressed the court and made the following oral "Motion for Ineffective Counsel":

> Ashley:  Your Honor, . . . I'm requesting Motion for Ineffective Counsel. . . .  Mr. Callum is not taking enough interest in this case on my behalf.  He has promised to correspond with me through the mail when I was in DOC [Department of Corrections] facility, which he did not do.  Promise me visits in the county jail to discuss discovery from the motion filed two months, which, once again, he has not corroborated with me in any way whatsoever.
>
> Your Honor, 'till this date Mr. Callum has made no attempt to meet or speak with me concerning the issues I'm faced with.  I am pleading with the Court that the Court will assist me with counsel that can better represent me and defend me in receiving a fair trial.
>
> The Court:  I vaguely remember we went through this once before and I'm going to deny your motion.  I know Mr. Callum, because of his motion, to some extent, I guess, [is] still trying to get everything together, and I know he also, last time, said he had somebody who was working with an expert on DNA or somebody who has more knowledge on that particular issue . . . .
>
> Ashley:  I was supposed to start trial. Shouldn't that stuff already been here already, ready to go? . . .  I have to waive my right [to a speedy trial] because, you know, you guys ain't ready or whatever.
>
> Callum:  Let's go to trial.  Let's go to trial.
>
> Ashley:  I don't want to go to trial with you.
>
> Callum:  I don't want to go to trial with you neither, but let's go to trial.

Ashley:  Conflict of interest. . . . .  He just said, I don't want to go to trial.

Callum:  Not under this circumstance, Judge. . . .  [W]e just got the [DNA evidence] Thursday. . . . It takes them time to put a case together that has DNA. . . .  If he wants to go to trial, it's his right, but I don't want to.  And if that's what he's complaining about, I'm only –

Ashley:  I'm complaining about no communication. . . .

Callum:  At this point, we have not been in a place where we can sit down and talk because we have not had the DNA stuff until Thursday.

Ashley ultimately agreed to waive his right to a speedy trial so that his counsel could investigate the DNA evidence.

Approximately two months before trial, Callum filed a motion to exclude the DNA evidence, challenging the reliability of the testing and results.  He also filed a motion to suppress evidence of the victim's identification of Ashley from the photographic lineup.  The trial court denied these motions at a pretrial hearing in January 2003.

The trial court held a final pretrial status conference on February 24, 2003, the day before trial began.  The transcript of that pretrial conference reflects that McGovern advised the court that one week earlier, she met in private with Ashley to notify him of and discuss a plea offer from the prosecution.  Ashley told the court that he "just walked out" of the meeting with McGovern because he was angry that McGovern was not concerned about him.  McGovern confirmed that Ashley had walked out of the meeting. However, at the postconviction hearing in 2010, Ashley testified differently, stating that, at the meeting in question, McGovern never told him that there was a plea offer, and that she had become angry and walked out on him.

At the conference the day before trial, Ashley also complained again to the trial court regarding his counsel:

Ashley:  [M]y public defenders are not . . .

4

representing me.  I have not spoke to none of them at all.  They have not seen me.  They have made – they both made incomplete statements to me.  [Callum] stated in November he didn't have no desire to deal with this case.  [McGovern] came to see me last week and . . . I was talking about the issues of my life and she said straight up, she didn't care.  You know, . . . that's impropriety statements they both have made against me.

Callum:  Don't have a comment.

The Court:  What are you asking for?

Ashley:  I'm asking for alternative counsel.

The Court:  Not going to do that.  The other alternative, you represent yourself.

Ashley:  . . . I can't represent myself.  I'm not saying that.

The Court:  Then we'll start trial tomorrow morning and if ya'll [sic] ready to proceed?

Ashley:  Your Honor, how do you start trial with somebody who – I have been locked up for a year now.  They haven't come to see me, haven't came up with defense strategy or nothing.

The Court:  Well, I'm not going to discuss your case.  That's not –

Ashley:  . . .  I'm not asking you to discuss it. I'm just saying . . . I have a case here –

The Court:  I – you can raise that on appeal. I'm not going – what you told me is you don't like how they prepared your case.

Ashley:  I'm not saying that.  I'm saying they don't like me or they're the ones with the conflict of interest.

5

The Court:  Do ya'll have a conflict of interest?

McGovern:  I don't think so.

The court indicated that trial would proceed the next day.

On the first day of trial, the court informed the jury venire of the charges and Ashley's not guilty plea.  Prior to voir dire and outside the presence of the venire, Ashley once again voiced concerns about his representation:

> [Ashley]:  I would like to say I don't agree in which way my public defenders are taking this case.  And also . . . I would like to file, a motion to dismiss.
>
> The Court:  . . . I believe Mr. Ashley . . . this motion relates to the same motion that was made on the record yesterday, and sounds very similar to the issues you brought up on that day. . . .
>
> [Ashley]:  [T]his pertains to the same thing.
>
> The Court:  Sure.  Anything else that you'd like to say at this time?
>
> [Ashley]:  No, sir.
>
> The Court:  Okay.  Your motion is denied.

As pertinent to this appeal, during his opening statement, Callum stated as follows:

> [W]e're not going to get up here and say that [Ashley] wasn't there.  His semen was on her panties. . . .  [A]nd you'll see a photograph of the driveway with some semen on the driveway.  So we're not going to come in here and say he wasn't there.  He was there.  But there was no intercourse.  None. . . .
>
> He may have attempted sexual assault, but you have to consider where the semen is. . . .

6

> You said that you could listen to the evidence
> and could convict a person of what they did,
> and only what they did. . . .  [W]e'll be asking
> you to do that.  To convict him of only what he
> did, and no more.

Ashley did not advise the trial court that he disagreed with
this trial strategy.

During trial, a forensic analyst testified for the
prosecution that the semen found in the victim's underwear
contained DNA consistent with Ashley's, and that the
probability that the semen belonged to someone other than
Ashley was less than 1 in 57,724 quadrillion.  The analyst
further testified that the genetic material found on the
pavement at the scene also matched Ashley's, and that the
probability that it belonged to someone else was less than 1
in 211,000.  A police officer then testified that the victim had
positively identified Ashley from a photographic lineup.

During the trial court's *Curtis* advisement, Ashley
asked, "If I did testify, does that mean they're able to bring
up all my past felonies . . . in front of the jury?"  The trial
court advised Ashley that the prosecution could bring up the
fact that he had prior felony convictions.  Ashley then
confirmed his knowing and voluntary decision not to testify.

During Callum's closing argument, in acknowledging
the evidence adverse to Ashley, he made the following
statements:

> This is not a whodunit.  We never said it was a
> whodunit.  We told you from the beginning he
> was involved.  This is a "what did he do"? . . .

> Mr. Ashley ejaculated on her panties that were
> down around her ankles, down around her
> knees, even before he had an opportunity to
> have intercourse with her.

> That's why.  That's why the semen is down
> there.  That it didn't run down her hips.  That's
> why it's here and not on her.  Because he
> didn't get a chance. . . .

I'm going to ask you to disregard your feelings and to follow the law, and convict Mr. Ashley of what he did and only of what he did.  Convict him of attempted sexual assault.  Convict him of kidnapping without the sexual assault, because there's no sexual assault.  This was an attempt. . . .  And find him not guilty of robbery.

Again, however, Ashley did not indicate to the trial court that he disagreed with counsel's trial strategy reflected in these statements.

During the prosecution's rebuttal closing argument, Ashley interrupted and said, "I'm sorry.  I didn't tell this man nothing that I said, that I committed this crime.  I'm innocent. . . . I'm innocent of these charges."  The trial court sent the jury to the jury room, and the following exchange occurred:

[Ashley]:  How can you go up and say that I did these things?  You're my attorney.  You're supposed to be fighting for my rights. . . .  You actually told them that I did it.  I told you all along that I'm innocent of these charges . . . .

The Court:  I gave you the opportunity to take the stand if you wanted to.  And you decided that you did not want to take the stand.  You cannot make statements to the jury at this time. . . .

[Ashley]:  I have been telling all along I didn't agree with what these people are talking about. . . . That's why I have been trying to get alternative counsel, because these people they think – they didn't come up and tell me they're going to come up and say I actually did that crime.  That's what I've been trying to tell you, sir. . . .

We never communicated. . . .

The Court:  Obviously you disagree with the way they're going.  Just because there's a disagreement with how they choose to defend

you and what you believe they should do is not incompetency of counsel.

These comments by Ashley during the prosecution's rebuttal closing argument were the first time he expressly stated to the court that he disagreed with his counsel's trial strategy and wanted, instead, to pursue a total innocence defense.

Ashley continued to assert that his counsel was incompetent and had violated his constitutional rights by telling the jury that he was "guilty." The trial court again rejected Ashley's arguments, and brought the jury back into the courtroom.

After the prosecution resumed its rebuttal, Ashley asked to leave the courtroom, stating again the he was innocent. He was escorted out of the courtroom.

The jury found Ashley guilty as charged of two counts of second degree kidnapping, sexual assault, and robbery. The court sentenced him to an indeterminate term of fifty-four years to life in the Department of Corrections.

Ashley appealed his conviction and sentence on various grounds. He did not, however, appeal the trial court's decision denying his request for substitute counsel. A division of this court vacated one of the kidnapping convictions and the associated sentence, but affirmed the judgment in all other respects. **People v. Ashley**, (Colo. App. No. 03CA1222, Mar. 9, 2006) (not published pursuant to C.A.R. 35(f)).

In June 2007, Ashley filed a timely Crim. P. 35(c) motion seeking postconviction relief, based on various allegations of ineffective assistance of counsel. In July 2009, Ashley's appointed postconviction counsel filed a supplemental Crim. P. 35(c) motion. As pertinent here, Ashley argued in the supplement that his trial counsel had violated his constitutional rights by forcing him "to choose between counsel or an innocence based defense."

The postconviction court held an evidentiary hearing in December 2010. Ashley testified that he had met only twice in private with Callum, and that Callum had never told him what theory of defense he would be pursuing at trial. He

asserted that during approximately ten court appearances, Callum never spoke to him.  Ashley also testified that he had told Callum that he was innocent, that he had not been at the scene of the crime, that it was "impossible" that his DNA was found at the scene, and that his "recollection" was that at the time of the crime he was at home with his wife.  He also testified that his trial counsel had never notified him that the prosecution had made a plea bargain offer.  Finally, Ashley asserted that he had wanted to testify at trial that he was innocent.

Ashley's wife also testified at the hearing.  She testified that, while she could not remember precisely the night of the crime, she "would have noticed if [Ashley was] gone that night," and that she did not "recall him ever being gone during the night during that month."  She stated that Ashley was "pretty much" home twenty-four hours a day at the time of the crime due to a back injury.  Finally, she explained that, while she had not provided a statement to the police regarding Ashley's alibi, she had tried to talk to Callum about it "on several occasions," but was rebuffed.  Neither Ashley nor the prosecution called Callum or McGovern to testify at the hearing.

After the close of evidence, postconviction counsel argued that Callum "effectively pled [Ashley] guilty to a lesser offense against his will by making a judicial admission in his opening and closing argument."  The following colloquy then occurred:

> The Court:  But let's forget – the opening statement left doors open.  Based on the evidence that was presented by the People, what other credible [closing] argument could – with the defendant choosing not to testify, could the defense have made?
>
> [Defense counsel]:  I don't think they could have made another credible argument.  And I concede that, Your Honor.  But the fact of the matter is that . . . the defense lawyer chose not to proceed with any other theory, chose not to investigate the case, and chose basically to stipulate to the DNA evidence without [Ashley's] permission.

> The Court:  But on a 35(c) hearing, typically if you want to say that the lawyer is ineffective by failing to investigate, you present the investigation that should have been done. . . . [T]he only evidence that's been presented is basically the defendant's own statement, which was available and he chose not to present in the original trial.

> [Defense counsel]:  Correct.  And also his wife's statement that he was home.  And – and that's all . . . at this time.

After hearing argument from both parties, the postconviction court then made a comprehensive oral ruling, denying Ashley's motion and making detailed findings of fact and conclusions of law.

After reciting the facts and procedural history of the case, the court began its analysis by making the following credibility determinations.

> First, the Court finds the defendant's testimony to be not particularly credible on most issues. . . .  [M]uch of it contradicts what is in the transcript.  For example, his statements that he was never told about an offer . . . his statements regarding the lawyers not discussing whether or not he . . . [would] testify at trial, when he told Judge Mullins that they advised him it would not be good. . . .

> Ms. Ashley's testimony, similarly, was not particularly strong or credible.

The postconviction court also found, as pertinent here, that Callum's opening statement had not precluded Ashley from testifying as to his innocence, nor did it infringe on Ashley's right to enter a plea; and that Callum's closing argument was a proper strategic choice that presented "the only argument that would have been professionally reasonable."  With respect to Ashley's contentions that trial counsel had failed to adequately investigate an alibi defense or possible challenges to the DNA evidence, the postconviction court found that (1) neither Ashley nor his

11

> wife's testimony would have been "particularly credible in
> light of the overwhelming evidence presented at trial,
> including the DNA and the statistical values given to that
> DNA," and (2) Ashley had failed to establish any prejudice in
> counsel's failure to dispute the overwhelming DNA evidence.
> With respect to Ashley's assertion that counsel had a conflict
> of interest, the postconviction court found that the trial court
> properly determined there was no such conflict.

*People v. Ashley*, No. 10CA2460, slip op. at 1-15 (Colo. App. 2013) ([#13-11] at 2-16).

Mr. Ashley asserts three claims for relief in the Application.  He contends in claim 1 that he was denied the effective assistance of counsel because:  (a) there was a complete breakdown in communication with counsel; (b) counsel admitted Mr. Ashley was guilty during opening his statement and closing argument; and (c) counsel failed to investigate more thoroughly and challenge the DNA evidence.  Mr. Ashley contends in claim 2 that he was denied due process because the victim's out-of-court identification of him was based on an impermissibly suggestive photo array.  Mr. Ashley contends in claim 3 that his sentence was aggravated based on facts not found by the jury in violation of his right to a trial by jury under *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

## II.  STANDARDS OF REVIEW

I must construe the Application and other papers filed by Mr. Ashley liberally because he is not represented by an attorney.  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, the Court should not be an advocate for a *pro se* litigant.  *See Hall*, 935 F.2d at 1110.

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be

issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Mr. Ashley bears the burden of proof under § 2254(d).  **See Woodford v. Visciotti**, 537 U.S. 19, 25 (2002) (per curiam).

The Court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1).  **See Cook v. McKune**, 323 F.3d 825, 830 (10th Cir. 2003).  The threshold question the Court must answer under § 2254(d)(1) is whether Mr. Ashley seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final.  **See Williams v. Taylor**, 529 U.S. 362, 390 (2000).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." **Id.** at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case **sub judice**.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

**House v. Hatch**, 527 F.3d 1010, 1016 (10th Cir. 2008).  If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1).  **See id.** at 1018.

If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard [v. Boone]*, 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405).  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).
>
> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08.

*House*, 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry.  *See Williams*, 529 U.S. at 409-10.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather that application must also be unreasonable." *Id.* at 411.  "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671.  Furthermore,

> [E]valuating whether a rule application was unreasonable

14

> requires considering the rule's specificity.  The more general
> the rule, the more leeway courts have in reaching outcomes
> in case-by-case determinations.  [I]t is not an unreasonable
> application of clearly established Federal law for a state
> court to decline to apply a specific legal rule that has not
> been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks and citation

omitted).  In conducting this analysis, the Court "must determine what arguments or

theories supported or . . . could have supported[] the state court's decision" and then

"ask whether it is possible fairminded jurists could disagree that those arguments or

theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.*

In addition, "review under § 2254(d)(1) is limited to the record that was before the state

court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S. Ct. 1388,

1398 (2011).

Under this standard, "only the most serious misapplications of Supreme Court

precedent will be a basis for relief under § 2254."  *Maynard*, 468 F.3d at 671; *see also*

*Richter*, 131 S. Ct. at 786 (stating that "even a strong case for relief does not mean the

state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal
> court, a state prisoner must show that the state court's ruling
> on the claim being presented in federal court was so lacking
> in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for
> fairminded disagreement.

*Richter*, 131 S. Ct. 786-87.

The Court reviews claims asserting factual errors pursuant to 28 U.S.C. §

2254(d)(2).  *See Romano v. Gibson*, 278 F.3d 1145, 1154 n.4 (10th Cir. 2002).  Section

2254(d)(2) allows the Court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court.  Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct and Mr. Ashley bears the burden of rebutting the presumption by clear and convincing evidence.  "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'"  ***Miller-El v. Dretke***, 545 U.S. 231, 240 (2005) (quoting ***Miller-El v. Cockrell***, 537 U.S. 322, 340 (2003)).

Finally, the Court's analysis is not complete "[e]ven if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law." ***Bland v. Sirmons***, 459 F.3d 999, 1009 (10th Cir. 2006).  "Unless the error is a structural defect in the trial that defies harmless-error analysis, [the Court] must apply the harmless error standard of ***Brecht v. Abrahamson***, 507 U.S. 619 (1993) . . . ."  ***Id.***; ***see also Fry v. Pliler***, 551 U.S. 112, 121-22 (2007) (providing that a federal court must conduct harmless error analysis under ***Brecht*** anytime it finds constitutional error in a state court proceeding regardless of whether the state court found error or conducted harmless error review).  Under ***Brecht***, a constitutional error does not warrant habeas relief unless the Court concludes it "had substantial and injurious effect" on the jury's verdict.  ***Brecht***, 507 U.S. at 637.  "A 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." ***Bland***, 459 F.3d at 1009 (citing ***O'Neal v. McAninch***, 513 U.S. 432, 435 (1995)). "Grave doubt" exists when "the matter is so evenly balanced that [the Court is] in virtual

equipoise as to the harmlessness of the error." **O'Neal**, 513 U.S. at 435.  The Court

make this harmless error determination based upon a review of the entire state court

record.  **See Herrera v. Lemaster**, 225 F.3d 1176, 1179 (10th Cir. 2000).

If a claim was not adjudicated on the merits in state court, and if the claim also is

not procedurally barred, the Court must review the claim *de novo* and the deferential

standards of § 2254(d) do not apply.  **See Gipson v. Jordan**, 376 F.3d 1193, 1196 (10th

Cir. 2004).

### III.  MERITS OF APPLICANT'S CLAIMS

#### A.  Claim 1

The Court first will address the ineffective assistance of counsel claims.  It was

clearly established when Mr. Ashley was convicted that a defendant has a Sixth

Amendment right to the effective assistance of counsel.  **See Strickland v.**

**Washington**, 466 U.S. 668 (1984).  Ineffective assistance of counsel claims are mixed

questions of law and fact.  **See id.** at 698.

To establish that counsel was ineffective under **Strickland** Mr. Ashley must

demonstrate both that counsel's performance fell below an objective standard of

reasonableness and that counsel's deficient performance resulted in prejudice to his

defense.  **See id.** at 687.  "Judicial scrutiny of counsel's performance must be highly

deferential."  **Id.** at 689.  There is "a strong presumption" that counsel's performance

falls within the range of "reasonable professional assistance."  **Id.**  It is Mr. Ashley's

burden to overcome this presumption by showing that the alleged errors were not sound

strategy under the circumstances.  **See id.**  "For counsel's performance to be

constitutionally ineffective, it must have been completely unreasonable, not merely wrong." ***Boyd v. Ward***, 179 F.3d 904, 914 (10th Cir. 1999).  Furthermore, "because the ***Strickland*** standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." ***Knowles v. Mirzayance***, 556 U.S. 111, 123 (2009).

Under the prejudice prong Mr. Ashley must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Strickland***, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Id.***; ***see also Richter***, 131 S. Ct. at 792 (stating that "[t]he likelihood of a different result must be substantial, not just conceivable.").  In determining whether Mr. Ashley has established prejudice, the Court must look at the totality of the evidence and not just the evidence that is helpful to Mr. Ashley.  ***See Boyd***, 179 F.3d at 914.

Finally, conclusory allegations that counsel was ineffective are not sufficient to warrant habeas relief.  ***See Humphreys v. Gibson***, 261 F.3d 1016, 1022 n.2 (10th Cir. 2001).  If Mr. Ashley fails to satisfy either prong of the ***Strickland*** test, the ineffective assistance of counsel claims must be dismissed.  ***See Strickland***, 466 U.S. at 697.

### 1.  Complete Breakdown in Communication

Mr. Ashley contends in claim 1(a) that he was denied the effective assistance of counsel because there was a complete breakdown in communication with counsel.  The Colorado Court of Appeals applied the two-part ***Strickland*** test and reasoned as follows in rejecting this claim:

Ashley contends that there was a "complete breakdown in communication" between him and his trial counsel, resulting in a conflict of interest and in counsel's pursuing an improper defense strategy without discussing it with Ashley and contrary to his wishes.  Specifically, at the postconviction hearing, Ashley claimed that he was not aware of the defense theory of he case until the opening statement at trial, and would not have consented to it, had he known.  The record refutes Ashley's contentions.

Substitution of counsel may be warranted when there is a total breakdown in communication between counsel and the defendant.  *People v. Kelling*, 151 P.3d 650, 656 (Colo. App. 2006).  However, good communication does not guarantee effective assistance of counsel, and bad, or even, no communication does not necessarily equate to ineffective assistance of counsel.  *Id.* at 655 (citing *United States v. Lott*, 310 F.3d 1231, 1252-53 (10th Cir. 2002)).  Further, the right to counsel guarantees only competent representation and does not necessarily include a meaningful attorney-client relationship.  *People v. Arguello*, 771 P.2d 87, 91 (Colo. 1989); *People v. Hodges*, 134 P.3d 419, 425 (Colo. App. 2005), aff'd, 158 P.3d 922 (Colo. 2007).

If a trial court has a reasonable basis for believing that the lawyer-client relationship has not deteriorated to the point where counsel is unable to give effective assistance in the fair presentation of a defense, it is justified in refusing to appoint new counsel.  *Schulteis*, 638 P.2d at 15.

Further, a reversal of a conviction is not required where a defendant has placed on the record his or her reasons for dissatisfaction with counsel, those reasons would not qualify as good cause for substitution of counsel, and the defendant has not identified other reasons for dissatisfaction that would have been elicited through further inquiry by the trial court.  *Kelling*, 151 P.3d at 654.

The postconviction court found that Ashley's testimony regarding his allegations of a breakdown in communication was not credible and was contradicted by the record.  It also found that the trial court had consistently and correctly determined that there was no conflict of interest. We must defer to the postconviction court's credibility determinations, *Dunlap*, 173 P.3d at 1062, and we also

conclude that the record supports its factual findings that there was not a complete breakdown in communication here. *See Hodges*, 134 P.3d at 425-26.

The record shows that any early lack of communication between Ashley and counsel was justified because Callum had not yet received the DNA evidence and, therefore, could not definitively form a theory of the case to discuss with Ashley until he had access to and was able to evaluate that evidence.  The record shows that when it was available, counsel then delivered the discovery to Ashley for his review as well.

The record also shows that McGovern met with Ashley the week before trial regarding a plea offer from the prosecution.  At the pretrial conference the day before trial, Ashley confirmed this meeting, stating that he walked out because McGovern said she was not concerned about his personal problems.  To the extent Ashley testified at the postconviction hearing that McGovern never presented a plea offer to him and had herself walked out on the meeting without discussion, we defer to the postconviction court's determination that this testimony was not credible and was refuted by the record.

Moreover, contrary to Ashley's contention, the record also indicates that he was aware of trial counsel's defense strategy at the pretrial conference.  At that conference, he specifically stated that his problem with his counsel was not "how they prepared his case," thereby implying that he was aware of counsel's defense strategy; his only complaint was that his counsel did not like him.  The next day, prior to voir dire, he implied again that he was aware of the defense strategy but made no specific complaint about it and simply asked one more time for the court to dismiss his counsel for the same reasons he stated the day before (his counsel did not "like" him).  That Ashley may not have been happy with the defense strategy or did not agree with it does not demonstrate a complete breakdown in communication with his counsel, because any such disagreements pertained to matters of strategy and tactics that did not provide good cause for substitution of counsel.  *See Kelling*, 151 P.3d at 653; *Hodges*, 134 P.3d at 425.

While Ashley asserts that counsel came to see him at

20

the jail only twice, he also testified that he had approximately ten court appearances with counsel. Although Ashley claimed at the postconviction hearing that he never spoke to counsel during those ten appearances, we again defer to the postconviction court's finding that his testimony was "not particularly credible on most issues." *See Dunlap*, 173 P.3d at 1062.

In sum, we discern no error in the postconviction court's denial of Ashley's Crim. P. 35(c) motion on the ground that there was no complete breakdown in communication with his trial counsel constituting ineffective assistance of counsel.

([#13-11] at 23-28 (footnote omitted).)

Mr. Ashley does not cite any contradictory governing law set forth in Supreme Court cases or any materially indistinguishable Supreme Court decision that would compel a different result with respect to claim 1(a). Therefore, he fails to demonstrate the decision of the Colorado Court of Appeals rejecting claim 1(a) was contrary to clearly established law. *See House*, 527 F.3d at 1018. To the extent Mr. Ashley now contends he actually is challenging the trial court's failure to appoint substitute counsel in addition to trial counsel's effectiveness, the Court notes that such a claim is procedurally barred. *See Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir. 1998) (federal courts "do not review issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the default is excused through a showing of cause and actual prejudice or a fundamental miscarriage of justice."). The Colorado Court of Appeals specifically determined that state law prohibited Mr. Ashley from challenging the trial court's denials of his requests for substitute counsel in the postconviction proceedings because such a claim could have been, but was not, raised on direct appeal. (*See* [#13-11] at 23.) Mr. Ashley fails to

excuse his procedural default by showing either cause and prejudice or a fundamental miscarriage of justice.  Therefore, the Court will not consider the merits of any claim challenging the trial court's failure to appoint substitute counsel.

Mr. Ashley also fails to demonstrate that the decision of the Colorado Court of Appeals rejecting claim 1(a) was an unreasonable application of clearly established federal law.  Mr. Ashley does challenge certain factual findings made by the state court, including the findings regarding when counsel received the DNA evidence and whether he was aware prior to trial of the defense strategy counsel intended to pursue.  Mr. Ashley also challenges the state court's finding regarding his credibility, a finding that is like a finding of fact.  *See Morris v. Ulibarri*, 513 F. App'x 777, 778 (10th Cir. 2013).  The Court presumes the state court's factual findings and credibility determination are correct and Mr. Ashley bears the burden of rebutting the presumption by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  He has not met this burden because his conclusory allegations to the contrary are not clear and convincing evidence.

In light of the state court's factual determinations, and, in particular, the determination that Mr. Ashley's factual allegations and testimony were not credible, the state court's legal conclusion that Mr. Ashley's right to effective assistance of counsel was not violated as a result of a complete breakdown in communication with counsel is not unreasonable.  Mr. Ashley is not entitled to habeas relief with respect to claim 1(a) because he fails to demonstrate that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 131 S. Ct. 786-87.

### 2.  Admission of Guilt

Mr. Ashley contends in claim 1(b) that he was denied the effective assistance of counsel because counsel admitted he was guilty during his opening statement and closing argument.  More specifically, Mr. Ashley contends that counsel's statements were the functional equivalent of a forced guilty plea.  The Colorado Court of Appeals applied the two-part *Strickland* test and reasoned as follows in rejecting this claim:

> Ashley contends that his trial counsel effectively admitted his guilt during opening statement and closing argument, thereby depriving him of his constitutional rights to plead not guilty and to testify as to his complete innocence of all charges.  We are not persuaded.

> During his opening statement, Callum put Ashley at the scene of the crime, acknowledging that Ashley's semen was on the victim's underwear.  He stated that Ashley "may" have attempted a sexual assault, but that the evidence would show that he did not commit sexual assault.

> At the postconviction hearing, the court rejected Ashley's argument that these statements were "tantamount to defense [counsel] entering a plea of guilty on the defen[dant]'s behalf but without his permission":

>> The Court finds, based on the sections it read of the opening statement, that the opening statement . . . was much more benign than the opening statement that was the subject of review in the *Bergerud* case.

>> There's nothing in that opening statement that committed the – the defense to a particular position.  It didn't - - for example, in *Bergerud* where the defense counsel questioned the defendant's ability to even provide testimony, it had nothing of that sort.

>> It really challenged primarily whether or not a sexual assault had occurred.  So that the Court finds that it left open to the defendant his right to assert his own . . . other defenses or provide testimony that would not be discounted during

the defense case.

Further, the Court finds that the defendant chose not to testify, not because of the way that the case had been proceeding . . . .

The defendant did not testify, and it's clear from his statements today and from the record, because he had a prior conviction for sexual assault and . . . understood how devastating that would be in impeaching his credibility.

With respect to the closing argument, the trial transcript reflects that counsel conceded that Ashley had deposited semen in the victim's underwear and on the pavement at the scene of the crime.  However, he vigorously argued that the evidence showed that Ashley had not committed either sexual assault or burglary.  Counsel argued that, at most, Ashley had committed only the lesser included offense of attempted sexual assault and second degree kidnapping (without a sexual assault).

The postconviction court found that the statements in counsel's closing argument constituted the "only argument that would have been professionally reasonable" based on "the record before the jury . . . the testimony before the jury . . . the evidence and without the defendant's testifying and providing another defense."

The postconviction court expressly found that counsel's decision to argue a lesser included offense was a tactical and strategic decision that was not violative of the two-pronged *Strickland* test.  *See Arko*, 183 P.3d at 558 (decision whether to request lesser included defense instruction is a tactical decision made by counsel).

We conclude that the postconviction court's findings and conclusions regarding both the opening statement and closing argument are supported by the record, and that counsel's actions did not constitute ineffective assistance, nor did they prejudice Ashley pursuant to the second prong of the *Strickland* test.

We note that the supreme court has set a high bar for what constitutes an effective admission of guilt by counsel.

To violate a defendant's trial rights, the disputed statements must constitute a judicial admission, defined as "a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *Bergerud*, 223 P.3d at 700 (quoting *People v. Bertagnolli*, 861 P.2d 717, 720 (Colo. 1993)).  An actual plea of guilty "is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." *Sanchez-Martinez v. People*, 250 P.3d 1248, 1254 (Colo. 2011) (quoting *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)); *see also Arko*, 183 P.3d at 558 (distinguishing between a decision to plead guilty and a decision whether to request a lesser offense instruction).  Given that the jury instructions at trial still held the prosecution to its required burden of proof on all charges, we question whether either the opening statement or the closing argument constituted an effective guilty plea.

In any event, a review of the entire record reflects in five ways that counsel's performance and strategy was reasonable and that Ashley cannot demonstrate prejudice from counsel's concessions during either opening statement or closing argument.

First, we note that the postconviction court found that Ashley's testimony at the postconviction hearing was not credible.  Accordingly, to the extent Ashley testified that he disagreed with counsel's trial strategy, and told them so, we must defer to the court's credibility determinations.  And, of course, as discussed above, all of Ashley's complaints about his counsel (both before and during trial) had to do with a lack of communication.  As noted, the record reflects that the first time Ashley expressly articulated any disagreement with counsel's strategy was when he interrupted the prosecution's rebuttal closing, which, in our view, was, at best, self-serving and came way too late in the proceedings. This fact, alone, distinguishes this case from *Bergerud*, where the record was clear and undisputed that the defendant openly and expressly disagreed with defense counsel's strategy and consistently voiced his preference for a different defense theory.

Second, the opening statement did not otherwise

25

preclude Ashley from testifying as to his innocence.  Rather, although counsel made concessions regarding Ashley's being at the scene of the crime, he nevertheless left the door open for Ashley to testify and provide an alternative explanation as to what occurred or to testify that he had an alibi or other excuse.  However, the record clearly supports the postconviction court's finding that Ashley chose not to testify because he did not want his past felony convictions presented to the jury – not because he felt that the opening statement had rendered his decision to testify a nullity. Furthermore, the closing argument as well could not have impinged Ashley's right to testify because Ashley had already decided not to testify for wholly unrelated reasons.

Third, counsel was aware that there was overwhelming evidence placing Ashley at the scene of the crime and showing that he had ejaculated on the victim's underwear, including (1) there were astronomical odds against there being any mistake that Ashley's DNA was at the scene of the crime; (2) the victim had made a positive identification of Ashley in the photographic lineup; and (3) Ashley had not provided any alternative explanation for the adverse evidence admitted against him at trial.  Further, counsel was faced with a situation where Ashley would be subject to an indeterminate sentence to life if convicted of sexual assault, whereas an attempt conviction would protect him from such a sentence.

Given these circumstances, we conclude it could not have been ineffective assistance for Ashley's counsel to concede that Ashley was present at the scene of the crime, that he had some sort of contact with the victim short of a completed sexual assault, that he caused her underwear to be removed, that he ejaculated on her underwear, and that he moved her to a location behind the store where his DNA was found on the pavement.

Fourth, the record also supports the postconviction court's finding that, based on the evidence admitted at trial, Callum reasonably argued for a conviction on a lesser offense of attempted sexual assault at closing, thereby fulfilling his truth-seeking obligation to the court.  **See Bergerud**, 223 P.3d at 694 ("'decisions of trial strategy' available to defense attorneys are . . . bound on the one side by fundamental choices given directly to the defendant . . .

and on the other by the requirements of honesty and integrity imposed on officers of the court"); *see also Davis*, 871 P.2d at 777-78 ("In view of the limited options available to [defense counsel] . . . we are convinced that [counsel's] summation was the product of sound trial strategy. Accordingly, [counsel's] representation at this stage of the proceedings fell within the range of professionally competent assistance required by *Strickland*.").

Again, given the overwhelming evidence by [sic] Ashley's guilt, we perceive no basis for concluding that his counsel provided ineffective assistance by arguing in closing argument for conviction on lesser crimes, particularly where the record shows that Ashley had not insisted on a total innocence defense.  *See Arko*, 183 P.3d at 558; *Dunlap*, 173 P.3d at 1079-80 (defense counsel's strategy to maintain credibility with the jury by admitting during closing argument the horror of the charged crime and the defendant's responsibility was a perfectly reasonable tactical choice); *cf. Bergerud*, 223 P.3d at 692.

Fifth, because there was such overwhelming evidence of Ashley's guilt, we further conclude that Ashley did not (and cannot) demonstrate prejudice under the second prong of *Strickland*, because there was no reasonable probability of a different outcome at trial even without the concessions made by defense counsel during opening statement and closing argument.  *See Dunlap*, 173 P.3d at 1068-69; *see Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

In sum, we conclude the postconviction court did not err in ruling that trial counsel did not provide ineffective assistance of counsel that prejudiced Ashley by pursuing the challenged defense strategy in opening statement or closing argument, and did not, in pursuing such strategy, improperly impinge on Ashley's constitutional rights to enter a plea and testify in his defense.

([#13-11] at 28-37 (footnotes omitted).)

Mr. Ashley fails to demonstrate the state court's rejection of claim 1(b) was

contrary to clearly established law because he again fails to cite any contradictory governing law set forth in Supreme Court cases or any materially indistinguishable Supreme Court decision that would compel a different result with respect to claim 1(b). *See House*, 527 F.3d at 1018.  Mr. Ashley does contend that counsel's statements admitting his guilt to lesser crimes demonstrate counsel abandoned him and failed to subject the prosecution's case to meaningful adversarial testing.  A limited exception to *Strickland's* two-part test applies in situations that "are so likely to prejudice the accused that the cost of litigating their effect in the particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658 (1984).  One situation in which prejudice under *Strickland* will be presumed is when "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *Bell v. Cone*, 535 U.S. 685, 696 (2002) (quoting *Cronic*, 466 U.S. at 659).  However, an attorney's strategic decision to concede certain points or even guilt of a lesser offense is the not the equivalent of a complete failure to subject the prosecution's case to meaningful testing.  *See Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002) (concluding "strategic or tactical decisions are evaluated under *Strickland's* traditional two-pronged test" because "*Cronic* is reserved only for those extreme cases in which counsel fails to present any defense").  Thus, the state court's decision is not contrary to clearly established federal law.

Mr. Ashley also fails to demonstrate that the state court's rejection of claim 1(b) was an unreasonable application of clearly established federal law.  The Court has little to add to the state court's thorough analysis set forth above.  In short, the Court agrees the evidence against Mr. Ashley was overwhelming and, in light of such overwhelming

evidence, counsel's strategic decision to concede guilt to lesser offenses was not

deficient performance and did not prejudice Mr. Ashley. *See*, *e.g.*, *Haynes*, 298 F.3d at

382-83 (petitioner could not establish prejudice under *Strickland* stemming from

counsel's strategic concession, against petitioner's wishes, of facts amounting to

second degree murder because evidence of guilt was overwhelming).  In any event, the

state court's rejection of claim 1(b) certainly was not "so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility

for fairminded disagreement."  *Richter*, 131 S. Ct. 786-87.  As a result, Mr. Ashley is not

entitled to relief on claim 1(b).

### 3.  Failure to Investigate and Challenge DNA Evidence

Mr. Ashley contends in claim 1(c) that he was denied the effective assistance of

counsel because counsel failed to investigate more thoroughly and challenge the DNA

evidence.  The Colorado Court of Appeals applied the two-part *Strickland* test and

reasoned as follows in rejecting this claim:

> With respect to Ashley's contention that his trial
> counsel did not make adequate pretrial investigations to
> challenge the DNA evidence, the postconviction court found
> that, "even if the defense should have gone that course, no
> prejudice has been established," given that "there's no
> evidence that's been presented to the court today to say that
> this DNA was not the defendant's . . . or there's been no
> expert presented to say that this was an unreliable test and
> unreliable evidence."
>
> We perceive no error in the postconviction court's
> findings.  Furthermore, the record shows that Callum did
> investigate the DNA evidence, engaging an expert to assist
> him in reviewing the evidence.  He also filed a motion to
> suppress the DNA evidence, specifically challenging the
> reliability of the DNA testing.  Because this challenge was

> unsuccessful, we conclude that Callum made a professionally reasonable strategic decision not to challenge the DNA evidence at trial, given its accepted scientific accuracy, and given that he and McGovern did not want to open the door to any evidence that Ashley's DNA was in the CODIS system.

([#13-11] at 39-40.)

Mr. Ashley fails to demonstrate the state court's rejection of claim 1(c) was contrary to clearly established law because he again fails to cite any contradictory governing law set forth by the Supreme Court or any materially indistinguishable Supreme Court decision that would compel a different result with respect to claim 1(c). *See House*, 527 F.3d at 1018.

Mr. Ashley also fails to demonstrate that the state court's rejection of claim 1(c) was an unreasonable application of clearly established federal law.  Mr. Ashley contends only that the victim's failure to identify him at his preliminary hearing should have prompted counsel to further investigate the DNA evidence, an argument that addresses the first prong of the *Strickland* analysis.  However, this contention is belied by the state court's factual determination that counsel did, in fact, investigate the DNA evidence, a factual determination the Court presumes to be correct under § 2254(e)(1). Mr. Ashley also fails to demonstrate the state court's determination that counsel made a strategic decision not to challenge the DNA evidence at trial is an unreasonable application of the deficient performance prong of the *Strickland* analysis.  *See Strickland*, 466 U.S. at 690 (counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").  Finally, Mr. Ashley does not even address the fact that the state

court also rejected claim 1(c) due to his failure to demonstrate prejudice under

*Strickland*, which was based on the failure to present any evidence that would have

resulted from additional investigation of the DNA evidence.  In the absence of any

evidence of prejudice, Mr. Ashley cannot demonstrate the state court's rejection of claim

1(c) was "so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement."

*Richter*, 131 S. Ct. 786-87.  As a result, Mr. Ashley is not entitled to relief on claim 1(c).

## B.  Claim 2

Mr. Ashley contends in claim 2 that he was denied due process because the

victim's out-of-court identification of him was based on an impermissibly suggestive

photo array.  In this context, "due process concerns arise only when law enforcement

officers use an identification procedure that is both suggestive and unnecessary." *Perry*

*v. New Hampshire*, 132 S. Ct. 716, 724 (2012) (summarizing relevant standards clearly

established in prior Supreme Court decisions).  Furthermore, even if law enforcement

officers use a suggestive and unnecessary identification procedure, the resulting

identification need not be suppressed unless, based on the totality of the circumstances,

"improper police conduct created a substantial likelihood of misidentification." *Id.* at

724-25 (internal quotation marks omitted).

The Colorado Court of Appeals address the merits of claim 2 on direct appeal

and reasoned as follows in rejecting the claim:

> Defendant first asserts that the trial court erred in
> admitting the victim's pretrial identification because it was
> based on an impermissibly suggestive photo array.  We
> disagree.

In reviewing a trial court's ruling on the constitutionality of pretrial identification, we defer to the trial court's findings of fact, but may afford different weight to those facts and reach a different legal conclusion in light of the legal standard. *People v. Borghesi*, 66 P.3d 93 (Colo. 2003); *Bernal v. People*, 44 P.3d 184 (Colo. 2002).

A pretrial identification procedure violates a defendant's due process rights if it is so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. *People v. Monroe*, 925 P.2d 767 (Colo. 1996); *People v. Wilford*, 111 P.3d 512 (Colo. App. 2004) (*cert. granted* May 16, 2005).

The defendant has the burden of demonstrating that the photo array is impermissibly suggestive. If the defendant fails to meet this burden, no further inquiry is necessary. If the defendant meets this burden, the prosecution must then show that the identification was nevertheless reliable under the totality of the circumstances. *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed.2d 1247 (1968); *Bernal v. People*, *supra*.

To determine whether the photo array is impermissibly suggestive we consider the size of the array, the manner in which it was presented, and the details of the photographs themselves. *United States v. Wiseman*, 172 F.3d 1196 (10th Cir. 1999); *United States v. Sanchez*, 24 F.3d 1259 (10th Cir. 1994); *People v. Borghesi*, *supra*.

A photo array with as few as six photos is not a per se due process violation, but the fewer the photos, the closer the array must be scrutinized for impermissibly suggestive irregularities. *United States v. Sanchez*, *supra*; *People v. Borghesi*, *supra*.

When the number of photos is not so small as to make the presentation itself unfairly suggestive, and there is nothing in the manner of presentation that renders the procedure surrounding the identification suggestive, the inquiry is whether the array was so limited that the defendant was the only one to match the victim's description of the perpetrator. *Bernal v. People*, *supra*. However, police do not have to provide an array containing only carbon copies

of the defendant's picture; all that is required is that "the photos are matched by race, approximate age, facial hair, and a number of other characteristics." *People v. Webster*, 987 P.2d 836, 839 (Colo. App. 1998) (quoting *People v. Borrego*, 668 P.2d 21, 23 (Colo. App. 1983).

Defendant contends the photo array was impermissibly suggestive because police told the victim that there had been a DNA match, the victim was "excited" to come to the police station to make the identification, the array had only the minimum of six photos, and his was the only one with a yellowish hue.  We do not agree.

Here, because the array contained six photos, its size is not alone problematic.  The record reveals nothing suggestive about the manner of presentation of the array, either.  The detective who administered the presentation did not encourage the victim to make an identification and did not say anything to otherwise influence her decision.

The fact that the victim knew there had been a DNA match and was eager to view the photo array does not alter our conclusion.  *See People v. Walford*, 716 P.2d 137 (Colo. App. 1985) (an otherwise properly conducted lineup is not constitutionally infirm where a witness knows only that a suspect has been arrested and has been included in the lineup).  In any event, the detective gave the victim an admonition to address any heightened expectation she may have had that the perpetrator was included in the photo array:

> This group may or may not contain a picture of the person who committed the crime now being investigated.  The fact that the photos are being shown to you should not cause you to believe that the guilty person has been caught. You do not have to identify anyone.  It is just as important to free innocent persons from suspicion as it is to identify those who are guilty.

Regarding the details of the photographs themselves, an array that includes a photo that is unique in a manner directly related to an important identification factor may be impermissibly suggestive.  *See Bernal v. People*, *supra*

(concluding that photo array was impermissibly suggestive where witnesses described the perpetrator as Hispanic, and the defendant's photograph was the only one showing a man with stereotypically Hispanic features). However, differences in shade and tone do not render an otherwise proper photo array impermissibly suggestive. ***People v. Borghesi***, ***supra***.

. . . .

Here, the victim described the suspect as an African-American man, approximately 200 pounds, with a round face, double chin, and medium to dark complexion. All the photos in the array appear to fit this description. None of these features were uniquely highlighted by defendant's photo, and the photos were matched by race, approximate age, facial hair, hair length, and complexion. In addition, the detective gave another admonition addressing the factor defendant contends rendered the array impermissibly suggestive: "Pay no attention to whether the photos are in color or black and white or any other difference in the type or style of the photographs. You should study only the person shown in the photographs."

We therefore conclude the array was not impermissibly suggestive and the trial court did not err in admitting the out-of-court identification.

([#13-5] at 3-8.)

Mr. Ashley does not cite any contradictory governing law set forth by the Supreme Court or any materially indistinguishable Supreme Court decision that would compel a different result with respect to claim 2. Therefore, he fails to demonstrate the state court's decision with respect to claim 2 was contrary to clearly established law. ***See House***, 527 F.3d at 1018.

Mr. Ashley also fails to demonstrate the state court's rejection of claim 2 was an unreasonable application of clearly established federal law. Mr. Ashley does assert that the victim was told the suspect's picture was in the photo array. However, pursuant to §

2254(e)(1), the Court presumes that the state court's factual determinations are correct and Mr. Ashley bears the burden of rebutting the presumption by clear and convincing evidence.  He has not met this burden.  The state court record confirms, as the Colorado Court of Appeals found, that although the victim was aware of a DNA match in her case, she was not told the suspect's picture was in the photo array she was shown. The Court also presumes the state court's other factual determinations regarding the photo array are correct.  In light of these presumptively correct factual determinations, the Court cannot conclude that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 131 S. Ct. 786-87.  As a result, Mr. Ashley is not entitled to relief with respect to claim 2.

## C.  Claim 3

Mr. Ashley contends in claim 3 that his sentence was aggravated based on facts not found by the jury in violation of his right to a trial by jury under *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  The Supreme Court held in *Apprendi* that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.  The Supreme Court subsequently clarified "that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*"  *Blakely v. Washington*, 542 U.S. 296, 303 (2004).

The Colorado Court of Appeals on direct appeal determined that Mr. Ashley's

*Apprendi* claim lacked merit.

> Here, the trial court imposed an aggravated range sentence because defendant had five prior felony convictions and admitted at sentencing that he was on parole for a felony at the time he committed the instant offense.  Either of these factors justifies the trial court's imposition of an aggravated range sentence.  ***See Lopez v. People***, *supra* (affirming aggravated range sentence based on defendant's prior convictions); ***People v. Scott***, __ P.3d __ (Colo. App. No. 04CA2207, Nov. 3, 2005) (affirming aggravated range sentence based on defendant's admission that he was on parole for a felony at the time he committed the instant offense).

> The record belies defendant's contention that the trial court also relied on impermissible factors in imposing an aggravated range sentence.  But even if it had, defendant's sentence would stand nevertheless.  ***See Lopez v. People***, *supra* (an aggravated range sentence is constitutional if the trial court relied on any permissible factor, even if it also considered impermissible ones).

([#13-5] at 17-18.)

Mr. Ashley does not cite any contradictory governing law set forth by the Supreme Court or any materially indistinguishable Supreme Court decision that would compel a different result with respect to claim 3.  Therefore, he fails to demonstrate the state court's decision with respect to claim 3 was contrary to clearly established law. ***See House***, 527 F.3d at 1018.

Mr. Ashley also fails to demonstrate the state court's rejection of claim 3 was an unreasonable application of clearly established federal law.  Pursuant to § 2254(e)(1), the Court presumes that the state court's factual determinations are correct and Mr. Ashley bears the burden of rebutting the presumption by clear and convincing evidence. He has not met this burden.  The state court record confirms, as the Colorado Court of

Appeals found, that Mr. Ashley's sentence was aggravated based on his prior felony convictions and his own admission that he was on parole at the time he committed the relevant crimes.  In light of these facts and admissions, the state court's legal conclusion that no *Apprendi* violation occurred is not an unreasonable application of clearly established federal law.  *See United States v. Booker*, 543 U.S. 220, 244 (2005) (reaffirming the holding in *Apprendi* that "[a]ny fact (*other than a prior conviction*) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be *admitted by the defendant* or proved to a jury beyond a reasonable doubt.") (emphasis added).  Mr. Ashley's conclusory assertion that the trial court improperly relied on other facts in his presentence report does not alter this conclusion or demonstrate the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. 786-87.  As a result, Mr. Ashley is not entitled to relief with respect to claim 3.

    Under 28 U.S.C. § 2253(c)(2), this Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  Such a showing is made only when a prisoner demonstrates that jurists of reason would find it debatable that a constitutional violation occurred, and that the district court erred in its resolution.  Mr. Ashley has not made a substantial showing of the denial of a constitutional right.  Therefore, a certificate of appealability is denied.

    Under 28 U.S.C. § 1915(a)(3), the court certifies that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status will be denied

for the purpose of appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If

Mr. Ashley files a notice of appeal, he also must pay the full appellate filing fee or file a

motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth

Circuit within thirty days in accordance with Fed. R. App. P. 24.

## IV.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the **Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. §
2254** [#4] filed by Applicant Mark R. Ashley is **DENIED**;

2. That this case is **DISMISSED WITH PREJUDICE**;

3.  That there is no basis on which to issue a certificate of appealability under 28

U.S.C. § 2253(c); and

4.  That leave to proceed *in forma pauperis* on appeal is **DENIED** without

prejudice to the filing of a motion seeking leave to proceed *in forma pauperis* on appeal

in the United States Court of Appeals for the Tenth Circuit.

DATED at Denver, Colorado, November 25, 2014.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge